**NOT FOR PUBLICATION**  **CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE (a fictitious name), on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,<br><br>Defendant. | Civil Action No.: 05-2512 (JLL)<br><br>**OPINION** |

**LINARES**, District Judge.

This matter comes before the Court on the motion for partial summary judgment filed by Plaintiff John Doe ("Doe") and the cross motion for summary judgment filed by Defendant Hartford Life and Accident Insurance Company ("Hartford"). Doe commenced this class action on behalf of himself and similarly situated individuals against Hartford asserting claims under §§ 502(a)(1)(B) and 502(a)(3) of the Employment Retirement Income Security Act ("ERISA") alleging that Hartford wrongfully limited long-term disability benefits to Plaintiff and other class members. Doe also asserts a claim for attorney's fees and costs under § 502(g)(1). The Court has considered the submissions in support of and in opposition to the motions and decides this matter without oral argument. Fed. R. Civ. P. 78. For the reasons set forth below, Doe's partial motion for summary judgment is denied, and Hartford's motion for summary judgment is granted.

## BACKGROUND

A.  **Doe's Claim**

The essential facts in this case are not in dispute.  Doe first applied for short-term disability benefits in July 2001, claiming that he suffered from bipolar disorder. (Stmt. of Mat'l Undisputed Facts Submitted in Supp. of Hartford Life and Accident Ins. Co.'s Mot. for Summ. J. ¶¶ 6-7 [hereinafter "Def.'s Stmt. of Facts"].)  He was approved for short-term disability benefits, receiving them from July 11, 2001, through January 8, 2002. (Id. at ¶¶ 6, 8.)  On December 14, 2001, he applied for long-term disability benefits based on his bipolar disorder. (Id. at ¶ 9; App. of Exs. Submitted in Supp. of Hartford Life and Accident Ins. Co.'s Mot. for Summ. J., Ex. 6 [hereinafter "Def.'s Exs."].)  His claim for long-term disability benefits was approved by Hartford, but they notified him that the benefits would be limited to twenty four months under his disability plan's "Mental Illness" limitation. (Def.'s Stmt. of Facts ¶¶ 10-11.)  At that time Doe was covered under Thomson Holdings, Inc.'s Group Long Term Disability Plan. (Id. at ¶ 2.)  The benefits under this plan were provided pursuant to the terms of a policy that was issued and insured by Hartford (the "Policy"). (Id. at ¶ 3.)  In a letter to Hartford on May 7, 2002, Doe objected to the application of the twenty four month Mental Illness limitation in his case, asserting that bipolar disorder is not a mental illness within the meaning of the Policy because it is "the result of demonstrable structural brain damage." (Id. at ¶ 12.)  Hartford responded by letter on May 16, 2002, restating its position that Doe's disability was subject to the limitation. (Id. at ¶ 13.)

Through his attorney, Scott Riemer, Doe appealed this decision within Hartford. (Id. at ¶ 14; Def.'s Exs., Ex. 11.)  As part of the appeal, Mr. Riemer submitted a letter from one of Doe's

Page 2 of  20

treating psychiatrists, Dr. Printz. (Def.'s Exs., Ex. 11.) Mr. Riemer also included Dr. Printz's curriculum vitae. (Id.) Dr. Printz is an Assistant Professor of Psychiatry and the Director of the Bipolar Research Clinic at Columbia University College of Physicians; he has been treating Doe since January 2002. (Id.) Dr. Printz's letter references numerous medical research findings and opines that bipolar disorder is a "biological illness," not a mental illness. (Id.) He states that "numerous lines of evidence confirm that bipolar disorder is a biological illness, arising not from psychological, behavioral or emotional issues but from changes in brain structure and function likely originating in a patient's genetic makeup." (Id. at HL00448.) He also notes that "[o]ver the past ten years, there has been increasing evidence that bipolar illness is associated with structural brain changes." (Id. at HL00447.) Because in his opinion bipolar disorder is not a mental illness, he asserts that Doe "does not suffer from 'any psychological, behavioral or emotional disorder or ailment of the mind.'" (Id. at HL00449 (quoting a portion of the Policy).) Dr. Printz has not conducted any brain imaging or other laboratory tests to diagnosis Doe's condition. (See id., Ex. 12, Printz Dep., at 34:24-35:20.)

      Doe's appeal was assigned to Valerie Gay, a Hartford appeal specialist. (Def.'s Stmt. of Facts ¶ 20.) As part of her appellate review, Ms. Gay forwarded Dr. Printz's letter to the University Disability Consortium ("UDC") requesting a medical opinion addressing the issues raised in his letter. (See Def.'s Exs., Ex. 13.) The UDC referred the request to Dr. Andrew Brown, a board certified psychiatrist, who issued a report on January 8, 2003. (Def.'s Stmt. of Facts ¶ 22.) Dr. Brown stated that the reason for referral was that "[t]he insured's treating psychiatrist had submitted a letter in which he argues that bipolar disorder should be considered a physical disability rather than a mental illness;" he was asked to review the letter and "comment

on the opinion articulated by Dr. Printz." (Def.'s Exs., Ex. 13, at HL00464.) While acknowledging that Dr. Printz's opinions "underscore the importance of pursuing further research in this area," Dr. Brown opined that "the notion that these findings would imply that bipolar disorder is not a mental illness is highly problematic" and "flies in the face of modern medical practice." (Id. at HL00468.) He states that "[a] disease is considered a mental illness when its manifestations, or expression, is principally experienced and observed in the realm of the *psychological, behavioral, or emotional*." (Id. at HL00471-72 (emphasis in original).) He further states that:

> Bipolar disorder, like all illnesses which require psychiatric treatment, is expressed as a psychological, emotional, and behavioral pathology; hence it is rightly considered a *mental* illness. . . . The fact that we may discern a biological basis for the expression of symptoms and signs of a particular mental illness does not change the fact that such an illness represents and is experienced by its sufferers as a mental illness.

(Id. at HL00470 (emphasis in original).)

After receiving Dr. Brown's report, Ms. Gay again reviewed Doe's file. The documents that made up the administrative record that Ms. Gay considered in her review included Doe's medical information including reports from Dr. Levin, an Associate Professor of Clinical Psychiatry at the College of Physicians and Surgeons of Columbia University and Doe's treating psychiatrist since 1999, and treatment reports from Dr. Printz, Dr. Printz's letter to Hartford as part of Doe's appeal, Dr. Brown's report, and the Policy. (See Hartford Life and Accident Ins. Co.'s Opp'n to Plf.'s Stmt. of Uncontested Mat'l Facts Pursuant to L. Civ. P. 56.1 ¶ 46 [hereinafter "Def.'s Opp'n Facts"].) A letter from Dr. Levin, dated September 14, 2001, characterized Doe's ailment as a "psychiatric disorder" and stated that the treatment goals "being pursued . . . [are] a combination of psychiatric medication and psychotherapy." (Def.'s Exs., Ex.

21, at HL00196-97.) The "Psychiatric Attending Physician Statement of Disability" reports included in Doe's medical records identify his bipolar diagnosis as having an International Classification of Diseases, Ninth Revision, ("ICD-9") code of 296.80, 296.63, or 296.43. (Id. at HL00379, 00410, 00457, 00496.) After reviewing the information in Doe's file, Ms. Gay affirmed the decision to limit his benefits to twenty four months. Hartford informed Doe on December 12, 2003, that his long-term disability benefits would be terminated on January 8, 2004, the end of the twenty four month period. (Def.'s Stmt. of Facts ¶ 32.)

At no point has Hartford denied that Doe has bipolar disorder or is disabled because of this condition. Thus, the only issue in dispute is whether bipolar disorder is subject to the twenty four month Mental Illness limitation on benefits under the Policy. Relevant to that dispute, Hartford points out that in handling disability claims based solely on bipolar disorder, it has consistently applied the twenty four month limitation. (Plf. John Doe's Stmt. of Uncontested Mat'l Facts Pursuant to L. Civ. P. 56.1 ¶ 27 [hereinafter "Plf.'s Stmt. of Facts"]; Def.'s Opp'n Facts ¶ 27.)

      B.     The Hartford Long-Term Disability Policy

The Policy explicitly gives Hartford discretion in determining eligibility for benefits, stating:

> We [Hartford Life and Accident Insurance Company] have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

(Def.'s Exs., Ex. 1, at HL00096.) The Policy further provides that:

> If you are Disabled because of:
> 1.    Mental Illness that results from any cause;
> 2.    any condition that may result from Mental Illness;
> 3.    alcoholism; or
> 4.    the non-medical use of narcotics, sedatives, stimulants, hallucinogens, or

>   any other such substance,
> then, subject to all other Policy provisions, benefits will be payable:
> 1.   only for so long as you are confined in a hospital or other place licensed to provide medical care for the disabling condition; or
> 2.   when you are not so confined, a total of 24-months for all such Disabilities during your lifetime.

(Id. at HL00088.) "Mental Illness" is defined in the Policy as:

> [A]ny psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage.

(Id. at HL00098.) Finally, Hartford is both the claim evaluator and the claim payer for the benefits under the Policy. (Plf.'s Stmt. of Facts ¶ 5.)

## LEGAL STANDARDS

### A.   Summary Judgment Standard

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." On a summary judgment motion, the moving party first must show that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324. The non-moving party must offer specific facts that establish a genuine issue of material fact; the non-moving party may not simply rely on unsupported assertions, bare allegations, or speculation. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). But, the Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party.

See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

      **B.**    **Standard of Review Under ERISA**

    1. In general

An ERISA benefits denial is reviewed using a de novo standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where the administrator is vested with discretionary authority, "a deferential standard of review [is] appropriate;" a reviewing court is limited to determining whether the administrator abused its discretion. Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008) (quoting Firestone, 489 U.S. at 115). In the Third Circuit, "[u]nder the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn a decision of the Plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (internal quotations omitted). If the plan language is plain, then "actions taken by the plan administrator inconsistent with [those] terms . . . are arbitrary." Bill Gray Enters. v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001). Furthermore, the question of whether language is plain or ambiguous is a question of law for the court. Id.

Doe argues that under the doctrine of contra proferentum if a plan term is ambiguous, the ambiguity should be resolved in favor of the insured. (Plf.'s Br. and Mem. of Law in Opp'n to Def's Mot. for Summ. J., at 20 [hereinafter Plf.'s Opp'n"].) He cites to Heasley v. Belden & Blake Corp., which applied contra proferentum in the ERISA context in determining whether a

plan granted the administrator eligibility discretion. See 2 F.3d 1249, 1257-58 (3d Cir. 1993). However, in a post Heasley unpublished opinion, the Third Circuit stated that it "has applied contra proferentem in the ERISA context, but only to decide whether a plan granted discretion to the administrator." Ceccanecchio v. Cont'l Cas. Co., 50 Fed. Appx. 66, 73 (3d Cir. 2002) (citing Heasley, 2 F.3d at 1257-58). The Third Circuit also stated:

> We have never addressed whether contra proferentem may be applied where the plan administrator has discretion to interpret the terms of the plan and the standard of review is arbitrary and capricious. However, a number of other courts have concluded that the doctrine is inapplicable in those circumstances.

Id. District courts have held that "interpretation of ERISA benefit plans that give the plan administrator discretionary authority to construe the terms of the plan does not follow the principle of *contra proferentum*." See, e.g., Fahringer v. Paul Revere Ins. Co., 317 F. Supp. 2d 504, 519 (D.N.J. 2003). This Court finds this approach more consistent with the Third Circuit's guidance in Abnathya and subsequent decisions which direct that a reviewing court "may overturn a decision of the Plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." If contra proferentum were applicable in this context, then, contrary to Abnathya, a reasonable decision, supported by substantial evidence, would be overturned if the insured also provided a reasonable interpretation.[1]

---

[1] Doe also argues that the limitation should be strictly construed because it is an exclusionary clause. As an initial matter, the limitation provision at issue is not an exclusion from benefits, rather it merely limits the amount of benefits that may be received once a claim has been granted. In any case, because this doctrine of strict construal for exclusionary clauses is derived from the same source as that which guides the doctrine of contra proferentum, that in general insurance contract interpretation ambiguities should be resolved in favor of the insured, this Court finds that it is equally inapplicable in the ERISA context where an administrator has discretionary authority.

2.      Effect of a Conflict of Interest

Where an entity administering a policy operates in a dual role by both determining plan eligibility and paying the claims, there is a structural conflict of interest. Glenn, 128 S. Ct. at 2348. When such a conflict exists, the Supreme Court has directed that the reviewing court should "weigh[] [this conflict] as a factor in determining whether there is an abuse of discretion." Id. at 2350 (quoting Firestone, 489 U.S. at 115). The Court also held that they "do not believe that Firestone's statement implies a change in the *standard* of review, say, from deferential to *de novo* review." Id. (emphasis in original) ("Trust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion."). Thus, the Court stated that "the significance of the [conflict] factor will depend upon the circumstances of the particular case." Id. at 2346.

> [F]or example, [the conflict] should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Id. at 2351 (internal citations omitted).

Prior to the Glenn decision, the Third Circuit used a "sliding-scale" approach for determining how an administrator's conflict of interest should be taken into account by a

reviewing court. In Pinto v. Reliance Standard Life Insurance Company the Third Circuit held that "the best way to 'consider' . . . [a conflict of interest] is to use [it] to heighten our degree of scrutiny, without actually shifting the burden away from the plaintiff." 214 F.3d 377, 392 (3d Cir. 2000). Thus, "the greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard." Id. at 393 (quoting Vega v. Nat'l Life Ins. Serv. Inc., 188 F.3d 287, 297 (5th Cir. 1999)). In making this determination, the Pinto court directed reviewing courts to "look not only at the result–whether it is supported by reason–but at the process by which the result was achieved." Id.

The Third Circuit has yet to rule on whether Glenn is consistent with its sliding scale heightened review approach.[2] Arguably it is not in that adjusting the standard of review for all evidence based on one factor seems inconsistent with Glenn's statement that their approach does not imply a change in the standard of review and that a conflict is meant to be but one factor, whose individual significance may vary but only in so far as any factor's significance may vary depending on the facts of the case. However, because this Court finds a lack of evidence of significant conflict or bias, as discussed below, it is unnecessary for this Court to resolve this issue; either approach would produce the same outcome in this case.

3. Consideration of Evidence Outside of the Administrative Record

Although the general rule is that "the record for arbitrary-and-capricious review of ERISA

---

[2] Doe, in his brief, asserts: "The Court rejected standard of review tests, such as the sliding-scale method of review applied by this Circuit." (Plf.'s Br. and Mem. in Supp. of Mot. for Partial Summ. J., at 6 (discussing Glenn) [hereinafter "Plf.'s Summ. J. Br."].) Rather, Doe argues that any conflict should serve as a tiebreaker if the court finds the interpretations to be closely balanced. (Id. at 18.)

benefits denial is the record made before the plan administrator, and cannot be supplemented during litigation, when a court is deciding what standard of review to employ . . . it may consider evidence of potential biases and conflicts of interest that is not found in the administrator's record."   Kosiba v. Merck & Co., 384 F.3d 58, 67 n.5 (3d Cir. 2004) (internal citations omitted). Additionally, "where the evidence outside the administrative record is related to interpreting the plan or explaining medical terms and procedures relating to the claim," it may be considered by the court.  O'Sullivan v. Metro. Life Ins. Co., 114 F. Supp. 2d 303, 310 (D.N.J. 2000); see also Epright v. Envtl. Res. Mgmt., 81 F.3d 335, 339 (3d Cir. 1996).  However, a reviewing court is "precluded from receiving [extrinsic] evidence to resolve disputed material facts . . . ." O'Sullivan, 114 F. Supp. 2d at 310.

        **C.**      **Evidence of Conflict or Bias in this Case**

Here, both parties agree that the Policy gives the administrator discretion to interpret the plan and to determine benefit eligibility.  Thus, both parties agree that the appropriate standard of review is  whether the administrator abused its discretion.  Neither party argues for a heightened standard of review under Pinto.  However, Doe does argue that there were both structural and procedural deficiencies in Hartford's process that are evidence of Hartford's bias. The question, then, is how this Court's review should be adjusted to account for any structural or procedural deficiencies, if demonstrated.

First, Doe states that there is a conflict of interest because Hartford was both the claim payer and the claim evaluator.  Neither party disputes this, and under Glenn, this fact creates a conflict of interest.  However, Doe has submitted no other evidence regarding the structure of

Hartford's operations or a pattern of bias. As the Court in Glenn noted, not every conflict of this sort will be significant, it is the particular facts that determine how much weight this factor should be given. Thus, while the Court takes note of Hartford's dual role, it finds no evidence in the record to accord this factor special emphasis.

Second, Doe argues that Hartford had a pattern and practice of routinely subjecting claims based on bipolar disorder to the twenty four month limitation. In other words, Hartford has consistently applied the Mental Illness limitation in cases solely involving bipolar disorder. This is not disputed. Doe asserts that this consistent application demonstrates a history of bias. Doe states that "Hartford has a substantial financial incentive to apply the Mental Illness Limitation to claimants with bipolar disorder. . . . Given that millions of Americans suffer from bipolar disorder, Hartford could save millions of dollars per year by applying the Limitation." (Plf.'s Summ. J. Br., at 18-19.) Generally, consistent application is evidence negating a finding of bias in a particular case. However, it is also true that "[p]ast practice is of no significance where the plan document is clear," Epright, 81 F.3d at 339; consistent misapplication of plain plan language may be evidence of bias. As discussed below, this Court finds that the language is not plain, and, thus, Hartford's consistent application of the limitation is not found to be evidence of bias.

Third, Doe asserts that Hartford routinely used the UDC to provide biased reviews of medical records. He provides no evidence of UDC bias in this case. Instead, he points to references questioning UDC's independence in other court decisions. (See Plf.'s Summ. J. Br., at 21-22.) However, in evaluating the opinions of physicians under ERISA, the Supreme Court in Black & Decker Disability Plan v. Nord stated that

> physicians repeatedly retained by benefits plans may have an incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements. But the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks. And if a consultant engaged by a plan may have an "incentive" to make a finding of "not disabled," so a treating physician, in a close case, may favor a finding of "disabled."

538 U.S. 822, 832 (2003) (internal citations and quotations omitted). Doe has produced no evidence supporting a conclusion that Hartford's used the UDC or Dr. Brown to procure a biased report in this case. Even if this Court were to give weight to the factual conclusions about the UDC and Hartford relationship drawn by other courts, this fact alone is insufficient to find bias in this case unless Ms. Gay's decision was based primarily on Dr. Brown's report, despite overwhelming evidence to the contrary in the record. For the reasons discussed below, this Court does not so find. Additionally, in this case, the significance of a treating physician versus non-treating physician is minimized as Doe's condition is not in dispute, what is in dispute is how bipolar disorder is meant to be treated under the Policy language.

Finally, Doe asserts that Ms. Gay did not look at and follow Hartford's claims procedure in making her decision because she failed to refer to and follow the guidelines provided in Hartford's BMS Reference Library ("BMS"). Doe asserts that Ms. Gay was required to follow the guidelines outlined in the BMS and that her failure to follow them is evidence of bias because the guidelines clearly point to a finding that bipolar disorder is not a mental illness subject to the twenty four month limitation under the Policy. Doe states: "The BMS is a reasonable interpretation of the Policy's Mental Illness Limitation and is, thus, conclusive as to the meaning

of the term "Mental Illness." (Plf.'s Summ. J. Br., at 14.)

> The BMS states that it:
>
> describes and interprets standard LTD contract provisions, statutory or legal issues and general guidelines in order to adjudicate LTD claims . . . If you are a member of the LTD Claim staff, you should refer to the appropriate sections in this manual *any time you need assistance in handling a claim*.

(App. of Exs. in Supp. of Plf.'s Mot., Ex. C, at BMS 1771 [hereinafter "Plf.'s Exs."] (emphasis added).) Additionally Ms. Gay's supervisor, Bruce Luddy, testified that "[t]here was no requirement that she refer to [the BMS]." (App. of Exs. in Supp. of Def.'s Opp'n to Plf., Ex. 6, at 18:15-22 [hereinafter "Def.'s Opp'n Exs."].) Thomas Pullman, Hartford's Best Practices Manager, also testified that the BMS "doesn't tell examiners exactly what they need to do. It's a resource if they do have a question." (Id., Ex. 7, at 70:8-71:3.) Thus, the evidence before the Court supports a finding that Ms. Gay was not required to consult with the BMS in every case.

Additionally, this Court finds that, contrary to Doe's reading of the BMS, had Ms. Gay consulted the BMS, it would have directed her to a conclusion that bipolar disorder was covered by the limitation, further undermining Doe's argument that her failure to consult it is evidence of Hartford's bias. The BMS states:

> When reviewing a claim for LTD benefits, the Examiner must determine if the Mental Illness Limitation applies. If the cause of the claimant's disabling condition is not immediately apparent, consider the following:
> • The treating physician is a Psychiatrist or a Psychologist.
> • The only diagnosis listed is for psychiatric (e.g., ICD-9 codes 290-316)*.
> • Only medications prescribed are those used to treat psychiatric disorders, or substance abuse.
> • Psychotherapy is the only prescribed treatment.
> * There are some ICD-9 codes within these ranges that are not considered "Mental

> Illness" and therefore would not be subject to the plan's Benefit Duration Limitation (i.e., 290.1, Presenile Dementia, which has an organic basis and thus is a physical disability). Always verify that the ICD-9 code represents a psychiatric disorder when determining if the Mental Illness Limitation applies.

(Id., Ex. 5, at HL00026.) Presenile Dementia, ICD-9 code 290.1, is listed under the heading "Organic Psychotic Conditions (290-294)." (Id., Ex. 2, at 4.) Bipolar Disorder, ICD-9 codes 296.4-296.7, is listed under the heading "Other Psychoses (295-299)." (Id. at 5-6.)

Doe asserts that what the BMS requires is a two step procedure wherein the claims specialist must first determine "whether the illness falls under an ICD-9 code within the range of 290 to 316," and, second, that "the examiners are then directed to verify whether the illness has an organic basis." (Plf.'s Summ. J. Br., at 14.) Doe argues that the step two verification is not meant to involve mere reliance on the categorization within the ICD-9, but rather personal verification on the part of the examiner. (Plf.'s Br. and Mem. of Law in Rep. to Def.'s Opp'n and in Further Supp. of Plf.'s Mot. for Partial Summ. J., at 6-7 [hereinafter "Plf.'s Rep. Br."].) Actually what the BMS says is to "always verify that the ICD-9 code represents a psychiatric disorder," referencing a standardized guide that specifically breaks out diagnoses considered "organic" (codes 290-294), which does not include bipolar disorder, from other psychoses, which does. Doe also argues that "[b]y focusing on the basis of the illness (*i.e.*, whether it is organic or inorganic), the BMS conclusively demonstrates that a Mental Illness is defined by its basis/nature, not by its manifestations." (Id. at 7.)

Dr. Levin, Doe's treating psychiatrist since 1999, characterized Doe's condition as a "psychiatric disorder." One of Dr. Levin's reports also states that Doe was being treated by a psychiatrist and psychologist and that he was being given psychiatric medication. Dr. Printz, in

his treatment reports referred to Doe's condition as a "psychiatric illness." Thus, three of the four BMS considerations appear to be met in this case. Even Doe's expert, Dr. Goodwin, in deposition testimony, stated that he "wasn't arguing that bipolar disorder is not a mental illness," rather he "was arguing that bipolar disorder is one of those mental illnesses that includes structural brain damage." (Def.'s Exs., Ex. 17, Goodwin Dep., at 64:19-65:10.) However, in this case, there is no evidence of structural brain damage, and Dr. Printz acknowledged in his deposition that "it is not true that all patients with [b]ipolar disorder have an identifiable, structural brain change."[3] (Def.'s Opp'n Exs., Ex. 3, at 57:4-6.)

This Court finds it a stretch to believe that Hartford intended the language in the BMS guidelines to refer claims specialists to a standardized medical classification system only to have them, despite their lack of medical training, independently question and verify if this internationally recognized guide correctly classifies illnesses. Doe clings to the one mention of an "organic basis" in the BMS asterisk notation clarifying the term "psychiatric" and attempts to elevate its significance to be the dispositive key to interpreting the Policy despite the lack of such a term in the Policy language and despite the context of the rest of the referenced BMS section which lists four factors to be considered and specifically refers to ICD-9 classifications. Thus, this Court concludes that Ms. Gay's failure to consult the BMS is not evidence of bias in this case.

This is simply not the typical case where courts have looked closely at an insurer's denial of benefits due to the presence of evidence of conflict or bias. See, e.g., Post v. Hartford Ins. Co.,

---

[3] Dr. Printz did opine that he thought that the lack of identification reflected technology limitations "not the presence or absence of a structural abnormality." (Def.'s Opp'n Exs., Ex. 3, at 57:6-9.)

501 F.3d 154, 164-65 (3d Cir. 2007) ("[A] review of the caselaw reveals that we have identified numerous procedural irregularities that can raise suspicion. The following is an illustrative, not exhaustive, list of the irregularities identified: (1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability.") (internal citations omitted). In this case Hartford has never denied that Doe had bipolar disorder or that as a result of this condition he was disabled. Thus, there was clearly no bias in the disability determination itself. Rather, Doe claims that there was bias because the benefits were limited, even though the limitation is consistently applied by Hartford when bipolar is the only disabling condition, as in this case. Doe additionally does not deny that Hartford could limit benefits for bipolar disorder regardless of its cause, he simply asserts that the policy language does not do so. Thus, Doe's arguments of bias are essentially the same as his argument regarding the reasonableness of Hartford's interpretation of Policy language. Doe starts by assuming that Hartford's interpretation is unreasonable and then asserts that any actions inconsistent with that conclusion are evidence of bias; additional evidence of bias separate from this legal argument has not been presented. Thus, the Court finds that Doe has not demonstrated that Hartford's denial was influenced by bias against Doe's claim.

   With this foundation, this Court will now turn to whether Hartford's position that bipolar disorder was covered by the Mental Illness limitation was an abuse of their discretion under the Policy.

**DISCUSSION**

As an initial matter, this Court finds that the Policy language with regard to the Mental Illness limitation is not plain. The Policy limits benefits when a claimant is "[d]isabled because of: 1. Mental illness that results from any cause . . . ." It then defines mental illness as "any psychological, behavioral or emotional disorder or ailment of the mind . . . ." The Policy itself does not refer to a standardized medical reference guide or list examples, providing no clear guidance whether bipolar disorder is the type of ailment that fits this definition. Thus, this Court finds that because the limitation is "subject to reasonable alternative interpretations," it is ambiguous. See Bill Gray, 248 F.3d at 218. Therefore, it is necessary to review Hartford's interpretation of this ambiguous language to determine if it is reasonable and supported by the record.

The administrative record before Ms. Gay consisted of the following items:

- The Policy
- Doe's medical record including reports from Dr. Levin and Dr. Printz.
- Dr. Printz's report submitted by Doe's attorney as part of his appeal which opined that bipolar disorder was not a "psychological, behavioral or emotional disorder or ailment of the mind."
- Dr. Brown's report that disagreed with Dr. Printz that bipolar disorder was not a mental illness.

The only piece of evidence in the administrative record that clearly supports Doe's position that his bipolar disorder is not a mental illness under the Policy is Dr. Printz's letter submitted by Doe's attorney as part of his appeal of the denial of his benefits. Dr. Printz's earlier reports described Doe's condition as a "psychiatric illness." Dr. Levin also described Doe's condition as a "psychiatric disorder," and his reports state that Doe was receiving psychiatric and psychological

care and taking psychiatric medication.  Dr. Brown, a board certified psychiatrist, stated his opinion that bipolar disorder was a mental illness.  Additionally, although Ms. Gay did not consult the BMS, the BMS does shed light on how Hartford intended the Policy to be interpreted.  As discussed above, this Court finds that the BMS guidelines direct that bipolar disorder be subject to the limitation.  Finally, although Doe argues that bipolar disorder does not fall within the mental illness definition because it has a biological basis, citing experts who opine that it is an illness "associated with structural brain changes," Doe does not assert that he falls within the exception for demonstrable structural brain damage.  In fact, no evidence has been submitted that Doe, personally, has any structural brain damage.  Thus, even without considering the other language in the policy, this Court finds that there was sufficient evidence in the administrative record, beyond merely Dr. Brown's report, for Ms. Gay and Hartford to reasonably determine that bipolar disorder is a mental illness under the Policy.

      This Court also finds Hartford's conclusion particularly reasonable when considered in light of the limitation language which limits benefits when a claimant is disabled for "mental illness that *results from any cause*."  Although Hartford's wording is imprecise, this Court finds it reasonable to read this clause in conjunction with the mental illness definition and find that the limitation includes "[a]ny psychological, behavioral or emotional disorder or ailment of the mind" resulting from any cause except where there is demonstrable structural brain damage.  Such a reading would appear to minimize, if not negate, the emphasis on cause that Doe so focuses on.

      Thus, even if the Court were to find Doe's interpretation reasonable, it does not alter the fact that Hartford's interpretation is reasonable and supported by substantial evidence.  Additionally, while this Court may find Doe's interpretation plausible, it does not find the two

interpretations closely balanced on the facts in this case, particularly looking at the administrative record before Hartford in making its determination. Therefore, the mere fact of Hartford's dual role as claim evaluator and payer, without more, does not tip the balance in Doe's favor. This Court finds that Hartford's decision to limit Doe's benefits was not arbitrary and capricious.

## CONCLUSION

Because this Court finds that there are no genuine issues of material fact and that Hartford's interpretation was not arbitrary and capricious, Hartford's motion for summary judgment is granted, and Doe's motion for partial summary judgment is denied. An appropriate Order accompanies this Opinion.

DATED: December 22, 2008         /s/ Jose L. Linares
                                 JOSE L. LINARES
                                 UNITED STATES DISTRICT JUDGE